UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
JEROME MACK,

                                     :

                     Petitioner,

                                      : **REPORT and RECOMMENDATION**

      -against-

                                      :     05 Civ. 6519 (LTS)(KNF)

JAMES T. CONWAY, SUPERINTENDENT
ATTICA CORRECTIONAL FACILITY,

                                      :

                     Respondent.
-------------------------------------------------------------x
KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

TO THE HONORABLE LAURA TAYLOR SWAIN, UNITED STATES DISTRICT JUDGE

## I. INTRODUCTION

Before the Court is Jerome Mack's ("Mack") amended petition for a writ of habeas

corpus, made pursuant to 28 U.S.C. § 2254, challenging his 2000 New York County conviction

for one count each of second-degree and third-degree criminal possession of a weapon.  Mack

contends his confinement by New York State is unlawful, because his constitutional rights were

violated when: (1) he was not advised of his rights, under Miranda v. Arizona, 384 U.S. 436, 86

S. Ct. 1602, (1966), prior to making incriminating statements to police personnel; (2) his counsel

rendered ineffective assistance to him, by: (a) failing to request "an instruction to the jury that it

could disregard the statements [made by Mack to detectives and police officers] . . . if the

prosecution failed to prove beyond a reasonable doubt that they were voluntary," and (b) failing

to "suggest meaningful responses to the jury's questions" on intent; and (3) the prosecution failed

to disclose exculpatory and impeaching information regarding the prior bad acts of a prosecution

witness, as required by Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963).  The respondent

opposes Mack's petition.  The petition is analyzed below.

## II.  BACKGROUND AND PROCEDURAL HISTORY

On May 12, 1999, Police Officer Shamus Shanahan ("Shanahan") responded to a radio transmission, which he received at 3:56 a.m., indicating a male had been "shot at the rear of 420 East 102nd Street."  When Shanahan arrived at the scene, he saw a person on the ground, later identified as Torin Mayfield ("Mayfield"), who appeared to be dead.  Shanahan received a second radio transmission, that "there were more victims" in apartment 1P.  Shanahan proceeded to apartment 1P, where Mack, Maurice Taylor ("Taylor"), Laurie Heyward ("Heyward"), and Tiffany Alexander ("Alexander"), had fled, after they observed an individual shoot a gun in their direction.  They described the shooter to police officers, and Mack then left the apartment.  A narcotics officer who was in the area, Jeff McAvoy ("McAvoy"), heard a radio dispatch describing the shooter; when he saw Mack walking on the street, he believed Mack matched the description.  McAvoy asked Mack to stop; Mack began to run, and McAvoy drew his gun and chased Mack.  Mack was ultimately apprehended, handcuffed and taken to the 23rd police precinct by McAvoy.

At the precinct, Mack was initially questioned by Detective Chris Loucas ("Loucas"). During a break from questioning, Loucas learned, from other police officers, that a gun had been found in apartment 1P.  When Loucas returned to the interview room, he asked Mack whether he knew anything about an object that had been found in apartment 1P.  Mack admitted he had left a gun underneath a cushion of the apartment's couch.  Approximately eight hours after this initial confession, Detective John Gisonno ("Gisonno") administered Miranda warnings to Mack, and Mack signed a statement acknowledging his possession of the gun found in apartment 1P. Gisonno then placed Mack under arrest.

2

Following the petitioner's arrest, he was indicted on one count each of second-degree and third-degree criminal possession of a weapon.  A pre-trial hearing was held, in October 1999, on the petitioner's motion to suppress his statements made to police officers and detectives.  At this hearing, Shanahan testified that, when he arrived at apartment 1P on the night of the shooting, he learned the apartment belonged to Linda Alexander ("L. Alexander"), who allowed police officers to enter her apartment.  Shanahan stated that, as police officers entered the apartment, Mack attempted to exit, and Shanahan "stopped . . . Mack, placed [his] hand on [Mack]" and informed Mack that he "can't leave until [Mack] sp[oke] to [police personnel]."  Shanahan "pushed him gently back into the apartment."  Shanahan questioned the people inside L. Alexander's apartment.  He learned the individuals were: (1) Mack, who did not have any injuries; (2) Taylor, who had "a bullet wound to the right buttock," which was "almost a flesh wound, a graze"; (3) Heyward, who "had a bullet wound to the left lower abdomen," (4) L. Alexander, who was not injured, and had not witnessed the shooting; and (5) Alexander, L. Alexander's daughter, who also was not injured.  When the witnesses to the shooting were asked to describe the shooter, they responded that the shooter was "a male black, about five foot nine, and dressed in all black– black jacket, and black pants."  Shanahan transmitted this description over his police radio.  Thereafter, Mack was allowed to exit the apartment.

McAvoy received this dispatch and saw an individual who matched the description. McAvoy asked this individual to stop, the individual began to run, and McAvoy sent a radio transmission indicating "he was in pursuit of a male who matched that description, and that he was chasing him."  Shanahan ran in the direction McAvoy indicated, via the radio transmission, and encountered McAvoy applying handcuffs to a "male down on the ground."  Shanahan

recognized the individual being handcuffed as Mack, since they had just met inside L. Alexander's apartment.  Shanahan informed McAvoy that Mack was a witness, and McAvoy's supervisor directed McAvoy to take Mack to the 23rd police precinct, "so detectives can talk to him."  After learning Mack had fled from the police, Shanahan became "suspicious . . . for his motivation to run from the scene," and "other officers shared [in this] suspicion."  This prompted Shanahan to return to L. Alexander's apartment and request L. Alexander's consent to search the premises.  Upon receiving her consent, Shanahan discovered a pistol underneath a cushion on the couch; L. Alexander informed Shanahan that Mack had been sitting on the couch earlier that morning.

Meanwhile, McAvoy transported Mack, who was still in handcuffs, to the 23rd police precinct, where Mack was taken to the "juvenile room" and then "uncuffed."  Testimony at the pre-trial hearing established that: (1) the "juvenile room" is situated within the precinct so that "the only door in and out of the juvenile room is . . . right behind where the desk sergeant is posted"; and (2) Mack was the only person in the juvenile room, which is approximately twelve by twelve feet in size.  Loucas entered the juvenile room, "sometime after 6 [a.m.]," and informed Mack that he "wanted to ask . . . several questions regarding the shooting that occurred."  Loucas interviewed Mack for approximately three hours, during which time Mack twice asked Loucas when he would be able to leave the precinct.  In response to Mack's inquiries, Loucas responded: "'Jerome . . . [t]his is a very important investigation.  I would like you to stay here until we gather all the facts, and see where this investigation is leading us to because you're a very important witness, and as soon as we get everything together, then you can go home.'"  Loucas also informed Mack "'I think you have to stay here until we conclude this

4

investigation.  I think we need your help, and you have to cooperate with me.  I need your help to solve this crime.'"

During the interview, Loucas "would leave the [juvenile] room, . . . leave [Mack] alone to meditate a little bit, [and then] come back."  Approximately two hours into his interview with Mack, Loucas left the juvenile room and learned a gun had been recovered from apartment 1P, but it was not known whose gun it was.  When Loucas returned to the juvenile room, he "looked [Mack] straight in the face" and said, "'the apartment that you were in, we found something. Could it possibly belong to you?  You know what I'm talking about.'"  Loucas told Mack to "'think about it and tell me what do you think we found in that apartment," and then left Mack alone in the juvenile room.  When Loucas returned, he asked Mack, "'What did we find in the apartment that possibly belongs to you,'" and Mack responded "'[t]he gun.'"  After learning the gun belonged to Mack, Loucas informed Mack that he was "'not interested in somebody possessing a gun or locking up somebody for possession of a gun.  I have a priority here.  My priority is solving a homicide.'"  According to Loucas, the extent of his questioning about the gun was: "'Is it your gun?  Did you fire the gun?  What caliber was the gun?'"  At no point during their interview did Loucas tell Mack that he was not free to leave, or that he was under arrest. Loucas testified that, while he was interviewing Mack, he closed the door to the juvenile room: (1) for "confidentiality purposes"; and/or (2) when Mack became "distraught" upon learning that Mayfield had died, and Mack may have requested that Loucas close the door.  Loucas' interview concluded shortly after Mack identified Mayfield's shooter as "D-Bone," whose name was later determined to be Devon Simmons ("Simmons" or "D-Bone").

After Loucas concluded his interview with Mack, Gisonno escorted Mack from the

juvenile room to a "detective robbery squad unit room," "some[time] before 9 am."  Gisonno left

Mack in this room and informed him that, if he needed anything–food, a cigarette, an opportunity

to use the restroom or to make a telephone call–Mack should contact Gisonno.  While Mack

waited, Gisonno spoke with "[a] lot of detectives [and] a lot of officers" in order to understand

the progress made in the investigation of the shooting.  Before noon, Gisonno learned that

Simmons had made a statement to police personnel, regarding the shooting, which included an

allegation that he saw Mack "pull something . . . from his jacket."  At approximately 4:00 p.m.,

on the afternoon of May 12, 2009, Gisonno displayed an array of photographs to Mack to see if

he could identify the shooter, and, at 4:30 p.m., Gisonno began questioning Mack.  According to

the arrest paperwork that was prepared on Mack's gun possession charge, Mack's "arrest time"

was at 4:35 p.m., at which time Gisonno administered <u>Miranda</u> warnings to Mack.

  In March 2000, the hearing court entered an order denying Mack's suppression motion.

In its decision, the court found that: (1) Mack was "in custody" when he was handcuffed and

transported to the 23rd police precinct, however, Mack's "status of a person in custody . . .

change[d] during the course of questioning [by Loucas because Mack] subjectively c[ame] to

believe that he [was] no longer in custody"; (2) a reasonable person in Mack's position would

understand, upon hearing Shanahan inform McAvoy that McAvoy had handcuffed a witness, that

he was thought to be a witness to the crime and "not a suspect in it"; (3) Loucas made it clear that

he was "asking for, not forcing, [Mack's] cooperation"; (4) during his dealings with Loucas and

Gisonno, Mack "trusted" these detectives, "believing that the police were interested in solving a

homicide and that he was not targeted for possessing the gun"; (5) Mack's eight-hour wait in the

precinct, from the time he was questioned by Loucas to the time Gisonno showed him a

photographic array, did not cause his "presence in the precinct [to] somehow revert[] to being

custodial," since there was "no constant questioning"; and (6) even if Mack's initial detention

was improper, his subsequent statement to police personnel was "sufficiently attenuated" so that

the "later statement [was] not tainted by the initial impropriety."   In further support of the finding

that the suppression motion should be denied, the hearing court explained:

> a period of over twelve hours lapsed between the defendant's initial detention and his
> statement to Gisonno, which is sufficiently long to support a finding of attenuation.
> . . .  Additionally, during that period the police independently developed probable
> cause to arrest defendant.  Even without resort to the defendant's initial confession,
> the police knew that the defendant inexplicably fled from McAvoy, they found the
> gun in the Alexander apartment, and they learned from Simmons that just before the
> shooting the defendant displayed a dark object which Simmons thought was a gun.
> Taken together, this information provided the police with independent probable cause
> to detain defendant and is a significant intervening event.

The hearing court also noted that, "although his early morning admission to Loucas about the gun

was not preceded by Miranda warnings, by the time he was given those warnings by Gisonno and

waived them, the defendant had resumed 'the status of one who is not under the influence of

questioning.'"

Trial commenced on June 6, 2000; testimony regarding Mack's confessions, similar to

that which was elicited at the pre-trial hearing, was introduced.  In addition to testimony from

police officers, Taylor, inter alios, testified about the events leading to the May 12, 1999

shooting.  According to Taylor, in April 1999, Simmons and Mack had a fight over "hustling,"

that is," "selling drugs," because they "can't be hustling in the same place."  Taylor explained

that Simmons sold marijuana, while Mack sold crack, and, because Mack won the fight, which

occurred on April 24, 1999, Simmons had to "get off the spot."

The following day, April 25, 1999, Taylor was in a staircase of his apartment building,

located at 420 East 102nd Street, in New York County, when he saw Mack and Mayfield "running

down the stairs with guns in their hands."  Taylor learned, approximately twenty minutes later,

that the door to Simmons' apartment had been "sho[]t . . . up," and Taylor saw "the door with the holes in it."  Taylor testified that he heard Mack and Mayfield "brag" about having shot at Simmons' door.

Taylor recalled that, on May 12, 1999, he was outside of 420 East 102nd Street at "a little bit before 4:00 [a.m.]," with Mack, Alexander, Heyward and Mayfield.  Taylor stated he had been with Mack from "about 10:00 that night," and knew Mack was carrying a gun, in his jacket pocket.  Taylor described Mack's gun as "nickel-plated with a little brown handle, like a 38." While this group was standing outside, Alexander saw someone standing underneath a ramp, "in the shadows," near the building.  Taylor testified that, when he looked in the direction Alexander indicated, he saw Simmons, and Taylor noticed that Mack "put his hand in his pocket," which caused Taylor to believe Mack was reaching for a gun.  Taylor stated that Simmons started shooting; Mayfield "hit[] the ground," and Mack, Alexander and Heyward ran away.  Taylor testified that Mack did not fire his gun. When the police arrived, Taylor provided officers a false name, because he "didn't want to be involved in nothing."

On cross-examination, Taylor admitted that, when he pleaded guilty to making a drug sale, he used the name David Haynes.  Taylor confirmed that: (1) he remembered testifying before a grand jury, six days after the morning Mayfield was shot; (2) he was under oath, while he testified at trial; and (3) he was under oath, when he testified before the grand jury.  Taylor was then questioned about his grand jury testimony:

> Q: Did you give these answers to these questions [before the grand jury]:
>      QUESTION: Was Torin [Mayfield] shot right there?
>      ANSWER:     Yes.  He got shot in his head.
>      QUESTION:  By D-Bone?
>      ANSWER:     Yes.
>      QUESTION:  Was anyone else shooting any shots?
>      ANSWER:     No.
>      QUESTION:  Do [sic] you see any other gun out there at all?
>      ANSWER:     No.

| Q | Did you give those anwers to those questions six days after this incident? |
|---|---|
| A | Yes, if that's what you're reading. |
| Q | Well, yes, . . . you heard me read there Mr. Taylor . . . the question specifically, did you see any other gun out there, and your answer is no, right, why are you down there telling the grand jury that? |
| A | What do you mean, maybe it's something I remembered.  I don't know, I don't remember, this was like two years ago. . . . |
| Q | Well, you remember so much, right, guns and shotguns, and now all of a sudden it's two years ago, right?  Did you answer that question in the grand jury truthfully six days after, right, I'm not talking about being dragged in here to a trial with your open case, I'm talking about six days later you said you didn't see any other gun, right? |
| A | Yes. |
| Q | Now you're coming in here saying you did, you're describing it and you're putting all these other little flourishes on it, right? |
| A | Yes. |
| Q | Well, after you went into the grand jury. . . . |
|   | * * * |
| Q | Did you give these answers to these questions [before the grand jury]. . . . |
|   | * * * |
|   | QUESTION: After that point in time [at the time of the shooting of Mayfield] did you have a gun? |
|   | ANSWER:     No. |
|   | QUESTION:  . . . .  Did you see Torin with a gun at all? |
|   | ANSWER:     No. |
|   | QUESTION:   Did you see Jermone [Mack] with a gun? |
|   | ANSWER:     No. |

When defense counsel asked Taylor "why did you say you did not see Jerome Mack with a gun,"
Taylor responded: "[w]hether he had a gun or not did not have nothing to do with Torin getting
killed."  Defense counsel inquired, "What does [C]ash mean, why do they call you [C]ash," and
Taylor responded "[t]hat's just a nickname I got."  Defense counsel asked whether the nickname
"Cash" had "to do with your drug dealing and drug business," and Taylor replied that it did not.
On redirect examination, Taylor clarified that he testified before the grand jury and in Mack's
trial that he never saw Mack display his gun during the episode when Mayfield was shot, and that
he knew Mack had a gun at the time Mayfield was shot.

The defense did not call any witnesses.  During closing arguments, defense counsel
highlighted reasons why the jury should discount Taylor's testimony, and attacked Taylor's

credibility by arguing that Taylor's grand jury testimony and trial testimony were in conflict and, further, that he lied at one of the proceedings.  In addition, defense counsel questioned whether Mack's statements to the police qualified as a confession, and argued that, at most, Mack's statements to the police demonstrated that he never had any intention of using a weapon.

After the prosecution delivered its closing argument, the trial judge discussed the proposed jury instructions with counsel.  The court inquired whether Mack's attorney wished for a jury instruction "with regard to the argument that you may be making with regard to the confession or statements in this case."  Mack's attorney responded, "I will not be requesting any specific language other than the language that is already contained in the charge with respect to the jury being the sol[e] finders of fact in this particular case."  After the trial judge read the instructions to the jury, he inquired whether the attorneys had any exceptions or requests; the prosecution and defense answered "no."

The jury began deliberating prior to the court's lunch break, on June 29, 2000, and, during the "afternoon session," two notes were submitted, by the jury, to the trial judge.  The first note had four sub-parts, which the trial judge read, as follows: (1)"'We would like to see the official wording of the second degree charge.  In parenthesis, all four parts.'"  The parties agreed that the court should respond by reading "the four elements of criminal possession of a weapon in the second degree"; (2) "'[i]f Somebody is carrying a gun for self-defense, by law does that constitute unlawful intent to harm'"; the parties agreed the trial judge should respond "self-defense is not a defense to criminal possession of a weapon in the second degree"; (3) "'the wording for the third degree charge,'" to which the parties consented to a reading, by the court, of the "four elements of criminal possession of a weapon in the third degree'"; and (4) "'Does unlawful possession,' and then there is an equal sign, 'equal intent to harm,'" and the parties agreed that the trial judge should "read them the shortened version of the presumption charge

10

having added at the very end that you the jury should consider all the defendant's acts and conduct that are relevant to the issue of his intent."  The second note asked: "'What is the time frame regarding intent, the time of the event in question or general at all times?'"  The parties agreed the following answer should be delivered to the jury: "the intent may be formed at any time."  After the jury's questions were answered, the jury continued to deliberate and reached the following verdict: guilty for second- and third-degree criminal possession of a weapon.

In July 2000, Mack was sentenced, as a predicate-felony offender, to concurrent terms of nine years imprisonment on the second-degree weapon-possession charge, and seven years imprisonment on the third-degree weapon-possession charge.  The sentencing judge noted that she was "taking into consideration" that the neighborhood, in which Mack's weapon was found, was one riddled with violence, and that Mack was "part of that ugly and horrible world out there."  She also noted that L. Alexander, who was a "devout member of the church," and who "helped her community" and was "fundamentally a social worker by virtue of her employment," provided compelling testimony of the violence existing around her apartment, and, in arriving at Mack's sentence, the judge indicated she considered "[w]hat . . . you [did] [to] her life."

In July 2002, Mack filed a motion, pursuant to New York Criminal Procedure Law ("CPL") § 440.10, to vacate the judgment of conviction.  Through his motion, Mack asserted his trial counsel provided ineffective assistance to him, by failing to: (1) seek an instruction that the jury could disregard statements Mack made to detectives, if the jury found Mack's statements were made involuntarily ("involuntary statement instruction"); and (2) suggest "meaningful responses" to the jury's second note, requesting clarification on the intent needed to be proven for a conviction for second-degree criminal possession of a weapon to be achieved.  In support of this motion, an affirmation by Mack's trial counsel, Patrick Brackley ("Brackley"), was submitted, in which Brackley stated, "when the Court raised the possibility of charging the jury

11

on the voluntariness of Mr. Mack's statements to the police, I did not at the time conceptualize the argument as an argument about the voluntariness of the statement."  Upon discussing this issue with Mack's appellate counsel, Brackley "realize[d] that I could have requested an instruction on voluntariness and this would have been consistent with my trial strategy."  In addition, Brackley stated:

> I also realize that when this Court asked about a voluntariness instruction, I could have requested an instruction that the jury could disregard Mr. Mack's first statement to Detective Loucas if it found that Mr. Mack was in custody when he gave the statement because Detective Loucas had not read Mr. Mack his Miranda warnings.  This would have been consistent with my trial strategy.
> When the jury asked the questions about the intent necessary to prove criminal possession of a weapon in the second degree, there were no strategic reasons for not requesting more expansive instructions that I now recognize, as a result of my consultation with appellate counsel, could have been given....
> * * *
> When the jury asked about the relationship between self defense and intent, it did not occur to me at the time to seek an instruction that if the jury found Mr. Mack possessed the gun because of his fear of imminent harm from Devon Simmons, then this could rebut the statutory presumption of intent. Crim. Proc. Law § 265.14(4) (McKinney 2000).  There was no strategic reason for not suggesting this response to the jury's question.

      By a decision dated October 31, 2002, Mack's motion was denied.  The court found that, under New York law, the proper inquiry to be made, in determining whether Mack's trial counsel rendered ineffective assistance to him, is not "whether the defendant might have been acquitted if the defense counsel had thought of all the arguments or tactics that appellate counsel, now with the advantage of hindsight, can conceive of, but, rather, whether a lack of strategy or effectiveness so impaired the trial that the defendant was denied a fair hearing."  (citing People v. Benevento, 91 N.Y.2d 708, 674 N.Y.S.2d 629  [1998]).  The court determined that defense counsel's failure to request a voluntariness charge may have been the product of a decision by counsel that the charge might confuse the jury, distract the jury from counsel's argument on summation or undermine stronger arguments.  With regard to Mack's claim, that his counsel

rendered ineffective assistance to him, by failing to request "meaningful responses" to the jury

notes, the court found that sufficient facts appeared on the record concerning this issue, such that

Mack was required to raise the claim on direct appeal, in the first instance.  (citing CPL §

440.10[2][b]).  The court also declared that, "having presided over the trial, the court finds that

trial counsel provided 'meaningful representation' to the defendant in all aspects of his trial."

In December 2002, Mack filed an application with the New York State Supreme Court,

Appellate Division, First Department, for leave to appeal from the denial of his CPL § 440.10

motion.  He also requested that the appeal from the denial of his CPL § 440.10 motion be

consolidated with his direct appeal from the judgment of conviction.  By an order entered in

March 2003, Mack's application, for leave to appeal, was granted, and Mack's direct appeal was

consolidated with his appeal from the denial of his CPL § 440.10 motion.  Mack's brief in

support of his direct appeal raised the following claims: (1) the police violated Mack's Fifth and

Fourteenth Amendment rights, by subjecting him to a custodial interrogation without first

administering Miranda warnings, and Mack's statements to the police were involuntary and the

product of the initial illegal questioning; (2) Mack's statements to police personnel should have

been suppressed, because the prosecution failed to establish probable cause existed for Mack's

"forcible transport to and confinement at the police station"; (3) the trial court violated Mack's

due process right, by instructing the jury that intent could be formed "any time"; (4) Mack's

counsel provided ineffective assistance to him, by failing to seek an "involuntary statements"

jury instruction and by failing to suggest "meaningful responses" to the jury's notes; and (5) the

sentencing court abused its discretion, "by ignoring traditional sentencing principles" and

determining that Mack was "part of an 'ugly and horrible world' that a church-going social

worker and mother had to endure."

In February 2004, the Appellate Division affirmed the petitioner's conviction,

unanimously.  See People v. Mack, 4 A.D.3d 126, 771 N.Y.S.2d 343 (App. Div. 1st Dep't 2004).

The Appellate Division found: (a) "at the time defendant made his initial statement to a detective,

prior to any Miranda warnings, defendant was not in custody," and his statement was made

voluntarily and was not the product of a prior unlawful detention; (b) Mack's subsequent

statements, made to "another detective," were made after Miranda warnings and were thus

voluntary and "sufficiently attenuated from both the prior statement and from the earlier Fourth

Amendment violation to be admissible"; (c) effective assistance of counsel was provided to

Mack, and the jury instructions Mack believes his counsel should have requested were "not

critical" to the defense and "their absence did not deprive [Mack] of a fair trial"; (d) no basis

existed for reducing Mack's sentence; and (e) Mack's remaining contentions were unpreserved

and the Appellate Division declined to review them in the interest of justice.  However, the court

noted that, if it did consider them, they would be found to be without merit.  Id.

The petitioner applied for leave to appeal to the New York Court of Appeals.  On May

19, 2004, that application was denied.  See People v. Mack, 2 N.Y.3d 802, 781 N.Y.S.2d 301

(2004).  Mack moved for reconsideration of the denial of his application for leave to appeal,

which the New York Court of Appeals denied, on August 26, 2004.  See People v. Mack, 3

N.Y.3d 677, 784 N.Y.S.2d 15 (2004).  Mack petitioned the United States Supreme Court for a

writ of certiorari, which was denied.  See Mack v. New York, 543 U.S. 965, 125 S. Ct. 423

(2004).

The instant application for a writ of habeas corpus was filed on July 19, 2005.  While his

petition was sub judice, Mack moved to stay proceedings, in this court, pending his return to state

court to file a second motion to vacate his conviction, pursuant to CPL § 440.10, based on newly

discovered evidence.  According to Mack, he learned the prosecution had withheld information

on Taylor, who testified on behalf of the state, in violation of Brady.  Specifically, Mack asserted

that Taylor was a member of the Bloods street gang, who, in November 1997, engaged in

"sadistic and depraved gang-related crimes, including but not limited to felony murder, depraved

indifference murder, robbery, assault, endangering the welfare of a child, tampering with physical

evidence, and intimidating witnesses."  In his motion, Mack provided details of these crimes,

though it was also noted that Taylor was not prosecuted for his involvement at the time Mack

filed his second CPL § 440.10 motion.[1]  In response, the assistant district attorney ("ADA")

represented that the Manhattan District Attorney's Office was not aware Taylor was involved in

the murder of the taxicab driver, because Taylor's use of aliases (i.e., "Cash") disguised Taylor's

identity; thus, he was not linked to both incidents.  Therefore, the ADA contended that, at the

time of Mack's trial, in June 2000, the prosecution was not obligated to provide any details to

Mack's counsel regarding Taylor's alleged activity in the 1997 robbery and murder described

above.

     In October 2006, Mack's second CPL § 440.10 motion was denied.  The court found that,

---

[1] Mack submitted, in support of his motion to hold his petition for a writ of habeas corpus in abeyance, pending exhaustion of his Brady claim in state court, a transcript of a videotaped interview conducted by two New York County assistant district attorneys, of a witness to a series of crimes perpetrated on November 14, 1997.  In the transcript, the witness, "B.W.," stated that "Cash" and "Love" arrived at his apartment, on November 14, 1997, and indicated they intended to harm B.W.'s girlfriend, who was thirteen years of age, because she told the police she was raped by members of the "Bloods" gang.  Cash was a known member of the Bloods gang.  B.W. attempted to negotiate with Cash and Love, since they had a gun, and B.W. did not want them to shoot his girlfriend.  Eventually, Cash and Love indicated that, if Love cut B.W.'s girlfriend, they would not shoot her.  B.W.'s girlfriend agreed to being cut to avoid being shot, and went to the roof of the building, where Love cut her, forced her to strip naked, told her to perform oral sex on Cash and B.W. (both of whom declined), and then allowed her to dress.  Thereafter, Love and Cash took B.W.'s girlfriend's earrings and beeper.  Cash told B.W. to call a taxicab so B.W. could take his girlfriend to a hospital, as it appeared she needed stitches.  When a taxicab arrived, Cash told B.W. that Love would take B.W.'s girlfriend to the hospital.  However, Love intended to rob the taxicab driver.  After the taxicab left B.W.'s apartment building, B.W. learned of the robbery plan, and Cash joked that Love might kill the taxicab driver accidentally.  After some time passed, Love and B.W.'s girlfriend returned, and Love stated she accidentally shot the taxicab driver in the head.  Cash stated the four of them would have to "stick together," and Cash and Love threatened that if anyone "snitched," they would "get" the person(s) who did.

while a "prosecutor has a duty to learn when the favorable evidence is known to its agents," that

duty does not extend to learning "if any witness in one case has been interviewed or questioned,

but not charged, in another case."  In addition, the court found that Mack did not suffer prejudice

from not having this information, since Taylor's credibility had already been impeached at trial.

Mack sought leave to appeal the denial of his second CPL § 440.10 motion; in December 2006,

the New York State Supreme Court, Appellate Division, First Department, denied Mack's

request.  In February 2007, Mack filed an amended petition for a writ of habeas corpus, which

added the Brady claim he asserted in his second CPL § 440.10 motion.

### III. DISCUSSION

A.     Failure to Provide *Miranda* Warnings

       "To protect the Fifth Amendment right against self-incrimination, the Supreme Court in

Miranda v. Arizona ruled that police may not interrogate a suspect who has been taken into

custody without first warning the person 'that he has the right to remain silent, that anything he

says can be used against him in a court of law, that he has the right to the presence of an attorney,

and that if he cannot afford an attorney one will be appointed for him prior to any questioning if

he so desires.' . . . If a suspect is not so warned, the prosecution is barred from using statements

obtained during the interrogation to establish its case in chief."  United States v. Newton, 369

F.3d 659, 668 (2d Cir. 2004) (quoting Miranda v. Arizona, 384 U.S. 436, 479, 86 S. Ct. 1062,

1630 [1966]).

       Constitutional safeguards articulated in Miranda apply when "a person in custody is

subjected to either express questioning or its functional equivalent."  Rhode Island v. Innis, 446

U.S. 291, 300-01, 100 S. Ct. 1682, 1689 (1980).  Thus, Miranda warnings do not need to be

given unless a person is both "in custody" and subject to "interrogation."  See Miranda, 384 U.S.

at 478, 86 S. Ct. at 1630.  A person is "in custody" for Miranda purposes if, under "the

circumstances surrounding the interrogation . . . a reasonable person [would not] have felt . . . at liberty to terminate the interrogation and leave." Thompson v. Keohane, 516 U.S. 99, 112, 116 S. Ct. 457, 465 (1995). The "ultimate inquiry," in determining whether a defendant was "in custody," for purposes of receiving Miranda warnings, is "whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." California v. Beheler, 463 U.S. 1121, 1125, 103 S. Ct. 3517, 3520 (1983). In other words, a court asks whether, "in addition to not feeling free to leave, a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest." Newton, 369 F.3d at 672.

The record reveals that Mack was "in custody," within the meaning of Miranda, when McAvoy chased Mack, with his gun drawn, and handcuffed and transported Mack to the 23rd police precinct. Upon arriving at the precinct, Mack was taken to the juvenile room, which was located behind a desk where a sergeant was stationed. It was not until Mack was deposited in the juvenile room that his handcuffs were removed, and he was questioned for approximately three hours by Loucas. Mack was not informed, during this time, that he was not under arrest, or that he was free to leave the precinct. In fact, when Mack inquired how much longer he had to stay at the precinct, Loucas responded: "'I think you have to stay here until we conclude this investigation. I think we need your help, and you have to cooperate with me. I need your help to solve this crime.'" A reasonable person in Mack's position would not have felt "at liberty to terminate the interrogation and leave," under these circumstances. Thompson, 516 U.S. at 112, 116 S. Ct. at 465. Being told "you have to stay here until we conclude this investigation," "we need your help," and "you have to cooperate with me," do not convey a spirit of voluntariness–these phrases suggest that Mack was obligated to remain at the precinct. While Mack stated "he would stay," in response to Loucas, such a response constitutes "mere

submission to a claim of lawful authority," rather than freely given assent.  Kaupp v. Texas, 538

U.S. 626, 631, 123 S. Ct. 1843, 1847 (2003) (internal quotation marks and citations omitted).

Therefore, the Court finds that the state court's determination, that Mack's first confession was

not obtained in violation of his Fifth Amendment rights under Miranda, was an unreasonable

application of clearly established Supreme Court precedent.

However, while the state courts applied Miranda unreasonably, this error is not grounds

for habeas corpus relief, because Mack has not shown that this error had a "substantial and

injurious effect or influence in determining the jury's verdict." Penry v. Johnson, 532 U.S. 782,

795, 121 S. Ct. 1910, 1919 (2001) (internal quotation marks and citations omitted).  In

determining whether a statement admitted in violation of Miranda is harmless, a court should

consider: (1) the overall strength or weakness of the prosecution's case; (2) the prosecution's

conduct with respect to the statement; (3) the importance of the statement; and (4) whether the

statement was cumulative to other admissible evidence.  See Zappulla v. New York, 391 F.3d

462, 468 (2d Cir. 2004).  Even if testimony relating to Mack's first confession had not been

admitted, Mack's later confession, given after Gisonno provided Miranda warnings to Mack, was

not made involuntarily.  In addition, Mack's initial confession was cumulative to his later

confession to Gisonno, the latter of which was admissible evidence.  See id.  The record does not

indicate the second confession was tainted by the first, and, since approximately eight hours

elapsed between the two confessions, the second confession was sufficiently attenuated from the

first to free it of any potential taint.  Mack has not shown that the failure to exclude the first

confession had a "substantial and injurious effect on the jury's verdict."  Therefore, granting

habeas corpus relief, based on Mack's Miranda claim, is not warranted.

B.     Ineffective Assistance of Counsel

To prevail on an ineffective assistance of counsel claim, a petitioner must show that: (1)

"counsel's performance was deficient," i.e., falling below an objective standard of reasonableness; and (2) counsel's "deficient performance prejudiced the defense," that is, "counsel's errors were so serious [they deprived] the defendant of a fair trial, a trial whose result is reliable." See Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984). There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689, 104 S. Ct. at 2065.

I.      Failure to Seek a Jury Instruction on the *Miranda* Issue

Mack argues that his trial counsel was ineffective for failing to seek a jury instruction on whether Mack's first confession was made while "in custody," and before he was advised of his Miranda rights. Despite the assertion in defense counsel's affirmation, that he had no strategic reason for not requesting such an instruction, the issue of suppressing the statement had been argued at length previously, and the trial court rejected Mack's argument urging suppression of his first confession. No authority has been provided, and none has been found by the Court, that counsel provides ineffective assistance when he does not seek a jury instruction on an issue whose merits have been rejected by the trial court previously. This dearth of authority suggests that it was not an unreasonable application of Strickland for the state courts to find that such conduct did not constitute ineffective assistance of counsel.

Even assuming, arguendo, that counsel's performance fell below an objective standard of reasonableness, defense counsel's failure to request a jury instruction on Miranda did not cause his client prejudice. This is so, because evidence of Mack's second confession was admitted at the trial; thus, the admission of evidence relating to Mack's first confession was, essentially, cumulative, and the evidence admitted on Mack's second confession provided a sufficient basis for a reasonable jury to conclude that Mack was guilty beyond a reasonable doubt. Accordingly, no reasonable probability exists that a different outcome, at trial, would have ensued, had counsel

requested a jury instruction germane to Mack's first confession.

    II.      Failure to Seek an Instruction on the
                    Voluntariness of Both Confessions Made to Police

Under New York law, "[o]nce a defendant raises a question of fact regarding voluntariness, the trial court must instruct the jury to disregard the statement if it is found to have been involuntarily made." People v. Johnson, 303 A.D.2d 903, 907, 757 N.Y.S.2d 349, 353 (App. Div. 3rd Dep't 2003). CPL § 710.70 provides that, even when the issue of the admissibility of a confession "was determined adversely to the defendant upon motion, the defendant may adduce trial evidence and otherwise contend that the statement was involuntarily made. In the case of a jury trial, the court must submit such issue to the jury under instructions to disregard such evidence upon a finding that the statement was involuntarily made." CPL § 710.70(3).

Mack alleges his counsel provided ineffective assistance to him, when counsel informed the trial court that he did not seek a jury instruction on the voluntariness of Mack's confessions. A review of the trial transcripts shows that, while facts were elicited regarding the detectives' questioning of Mack on the day of the murder, there is a dearth of testimony on whether Mack's confessions were given voluntarily. Therefore, the record does not establish that the petitioner "adduce[d] trial evidence and otherwise contend[ed] that the statement[s] [made to police were not] voluntarily made," so as to trigger CPL § 710.70(3)'s requirement that the court instruct the jury to disregard statements it finds were made involuntarily. In addition, with regard to Mack's second confession, given after Miranda warnings were administered to him, the testimony elicited at trial does not suggest this confession was involuntarily made.[2] Since Mack's first

_____

[2] Even if the Court were to find that a jury instruction was warranted, on the voluntariness of Mack's first confession, the omission of such an instruction, was, at most, harmless error. See, e.g., Nova v. Bartlett, 211 F.3d 705, 709 (2d Cir. 2000) (finding that, "in light of the fact that [the petitioner] made complete, detailed confessions after having been read his rights, the admission of his pre-warning statements, even if inappropriate, would amount to no more than

confession was cumulative to his second confession, the Court finds that Mack cannot show the requisite prejudice contemplated by <u>Strickland</u>.  Therefore, habeas corpus relief is not warranted for this claim.

      III.     Counsel's Failure to Proffer "Meaningful Responses" to the Jury's Questions on Intent

Mack alleges his counsel provided ineffective assistance to him by failing to suggest meaningful responses to the jury's questions on intent, since (a) "the only appropriate response by defense counsel to the jury's focused question [on intent] would have been to seek an instruction that if a person possessed a gun to protect himself from imminent threat of bodily harm, this could negate the statutory presumption of unlawful intent"; and (b) the court's response to the jury's question on the "time frame regarding intent"–that intent could be formed at any time– was "an incorrect statement of law."

      1.     Instruction that Self-Defense Negates the Presumptive Intent

New York Penal Law ("NYPL") § 265.15(4) states, in relevant part, "[t]he possession by any person of any . . . weapon [or] instrument . . . designed, made, or adapted for use primarily as a weapon, is presumptive evidence of intent to use the same unlawfully against another." "Justification based on self-defense . . . pertains only to the use of physical force. . . .  It does not apply to a crime based on the possession of a weapon, even though an element of the crime is that defendant possessed the weapon with the intent to use it unlawfully against another." <u>People v. Pons</u>, 68 N.Y.2d 264, 265, 508 N.Y.S.2d 403 (1986).  Consequently, based upon New York statutory and case law, Mack's claim, that his counsel should have sought a jury instruction that possessing a firearm, in self-defense, could negate NYPL § 265.15(4)'s statutory presumption of unlawful intent, is unavailing.

---

harmless error").

2.      Failure to Suggest Appropriate Response
Respecting Temporal Formation of Intent

In the memorandum supporting the petition for a writ of habeas corpus, Mack contends

that, when the deliberating jury inquired "What is the time frame regarding intent, the time of the

event in question or general at all times," "the only appropriate response to this question would

have been an instruction that the prosecution had to prove beyond a reasonable doubt that Mr.

Mack had that unlawful intent on the day he was charged with possessing the weapon, May 12,

1999."  However, the petitioner did not make citation to any authority supporting this

proposition.

The Second Circuit Court of Appeals has explained that, "[w]hile a weapons-possession

crime may be made more serious by the defendant's intent, it is the act of possessing a weapon

unlawfully which is the essence of the possession offenses defined in N.Y. Penal Law §§ 265.01-

265.05."  Davis v. Strack, 270 F.3d 111, 134 (2d Cir. 2001).  As noted above, under New York

law, "there are no circumstances when justification can be a defense to the crime of criminal

possession of a weapon."  Pons, 68 N.Y.2d at 267, 508 N.Y.S. 2d at 405.  Therefore, when a

defendant is justified in shooting a weapon, "under the particular circumstances existing at th[e]

moment [of the shooting], [it does not follow that] he lacked the intent to use the weapon

unlawfully during the continuum of time that he possessed it prior to the shooting."  Id. at 268,

508 N.Y.S.2d at 405.  The question the jury must answer, in such a situation, is whether "the

People established beyond a reasonable doubt that defendant possessed the weapon during [the

continuum of time prior to the shooting] 'with intent to use [it] unlawfully against another.'"  Id.

at 268, 508 N.Y.S.2d at 405 (quoting NYPL § 265.03).

Mack's contention that the trial court's response to the jury's note – asking, "What is the

time frame regarding intent–the time of the event in question or general, at any time?" – was

improper, and his counsel rendered ineffective assistance by failing to suggest an answer, is
unavailing.  Under New York law, the trial judge's answer, that intent may be formed "at any
time," was not improper.  In fact, in response to another question from the jury, which was
answered during the same session as the jury's "time frame" question, the trial court instructed that
"self-defense is not a defense to criminal possession of a weapon in the second degree," but noted
the jury "should still examine all the circumstances and the acts and the conduct of the defendant
before, during and after the commission of the alleged crime to determine the defendant's intent."
Taken as a whole, the trial judge's instructions to the jury, on the "time frame" for intent, appear to
be consistent with the views expressed by the Second Circuit Court of Appeals and New York
courts.  See Davis, 270 F.3d at 134 (finding that, a person may be found guilty of unlawful
possession of a weapon, "regardless that his actual, ultimate use of the gun might not have been
unlawful (because it was justified [and used in self-defense]. . . )[, since] he may have harbored
intentions to use the gun in other circumstances that would have been unlawful"); see also Pons,
68 N.Y.2d at 268, 508 N.Y.S.2d at 405 (stating that the jury must determine whether the People
established, beyond a reasonable doubt, that the defendant possessed a weapon, with the "intent
to use the weapon unlawfully during the continuum of time that he possessed it prior to the
shooting").  Since the petitioner does not make citation to any authority suggesting that unlawful
intent may be formed only on the day a person possesses a weapon and, further, inasmuch as case
law provides that intent may be formed either during the "continuum of time" prior to arrest, or
in those instances where it appears that the defendant "harbored intentions to use the gun in other
circumstances that would have been unlawful," Mack's counsel was not ineffective for failing to
suggest a response different from the one delivered, by the court, to the jury's inquiry regarding
intent.

C.     Brady Violation

"[T]he suppression by the prosecution of evidence favorable to an accused upon request

violates due process where the evidence is material either to guilt or to punishment, irrespective

of the good faith or bad faith of the prosecution."  Brady, 373 U.S. at 87, 83 S. Ct at 1196-97.

Since Brady, the Supreme Court has "held that the duty to disclose such evidence is applicable

even though there has been no request by the accused, . . . and that the duty encompasses

impeachment evidence as well as exculpatory evidence."  Strickler v. Greene, 527 U.S. 263, 280,

119 S. Ct. 1936, 1948 (1999) (internal citations omitted).

In order to establish a Brady violation, a criminal defendant must show that: (1) the

undisclosed evidence was favorable to him, either because it is exculpatory or because it is

impeaching; (2) the evidence was in the state's possession and was suppressed, either willfully or

inadvertently; and (3) the defendant was prejudiced as a result of the failure to disclose.  See

Strickler, 527 U.S. at 281-82, 119 S. Ct. at 1948.  In addition, the undisclosed evidence must be

"material," i.e., the defendant must show that there is a "'reasonable probability that, had the

evidence been disclosed to the defense, the result of the proceeding would have been different.'"

Id. at 280, 119 S. Ct. at 1948 (quoting United States v. Bagley, 473 U.S. 667, 682, 105 S. Ct. 3375,

3383 [1985]).  "In general, impeachment evidence has been found to be material where the

witness at issue 'supplied the only evidence linking the defendant[] to the crime,' . . . or where

the likely impact on the witness's credibility would have undermined a critical element of the

prosecution's case."  United States v. Payne, 63 F.3d 1200, 1210 (2d Cir. 1995) (internal

quotations and citations omitted).  "The defendant must establish all three prongs of the test –

favorable evidence, suppression and materiality – before there is any Brady violation."  Hughes

v. Phillips, 457 F. Supp. 2d 343, 359 (S.D.N.Y. 2006).

Mack has not made a Brady claim that warrants habeas corpus relief, since he is unable to

show that, the disclosure of information on Taylor's alleged criminal activity would have cast "the whole case in such a different light as to undermine confidence in the verdict." Id. At trial, Mack's counsel attacked Taylor's credibility, by questioning Taylor about his contradictory testimony, before the grand jury and on direct examination at trial, respecting whether Mack had a gun on the night of the Mayfield shooting.  Mack's counsel asked Taylor whether he testified falsely before the grand jury, or at trial.  This cross-examination of Taylor demonstrated that Taylor's testimony, either at the grand jury proceedings or at trial, was not truthful.  This provided the jury information that might cause it to discredit a portion(s) of Taylor's testimony, especially that which pertained to whether Mack possessed a gun.  In addition, Taylor testified, on direct examination, that he was arrested on drug charges, was sentenced to attend a drug treatment program and never completed the program.  Taylor also testified, on direct examination, that, on the night of the murder, he lied to the police and provided a false name.  Therefore, while the undisclosed information, that Taylor was accused of engaging in criminal activity, may have undermined Taylor's credibility further, Taylor's credibility was attacked at the trial and, as a consequence, the jury had sufficient information to determine what, if any, weight it should give to Taylor's testimony.  In the circumstance of the instant case, it does not appear that the undisclosed evidence would have caused such an "impact on the witness's credibility [so as to] undermine[] a critical element of the prosecution's case."  Payne, 63 F.3d at 1210.

In addition, Taylor did not provide the only evidence linking Mack to the couch in L. Alexander's apartment, or to the firearm found beneath a cushion of that couch.  The jury heard testimony from police officers who interviewed Mack, and testified that Mack confessed to possessing the gun found in L. Alexander's apartment.  Witnesses to the Mayfield shooting, who fled to L. Alexander's apartment, testified that Mack was in the apartment after Mayfield was shot, and L. Alexander told Shanahan Mack had been seated on the couch, where the gun was

25

found. Therefore, the undisclosed evidence of Taylor's alleged criminal activity was not

"material," since several witnesses supplied evidence linking Mack to the crime, and defense

counsel possessed other evidence, with which he impeached Taylor's credibility. Id.

## IV. RECOMMENDATION

For the reasons set forth above, I recommend that Mack's amended petition for a writ of

habeas corpus, Docket Entry No. 24, be denied.

## V. FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure,

the parties shall have fourteen (14) days from service of this Report to file written objections.

See also Fed. R. Civ. P. 6. Such objections, and any responses to objections, shall be filed with

the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Laura Taylor

Swain, 500 Pearl Street, Room 755, New York, New York, 10007, and to the chambers of the

undersigned, 40 Foley Square, Room 540, New York, New York, 10007. Any requests for an

extension of time for filing objections must be directed to Judge Swain. FAILURE TO FILE

OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF

OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. See Thomas v. Arn, 474 U.S.

140, 106 S. Ct. 466 (1985); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d

Cir. 1993); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992); Wesolek v. Canadair Ltd., 838

F.2d 55, 58-59 (2d Cir. 1988); McCarthy v. Manson, 714 F.2d 234, 237 (2d Cir. 1983).

Dated: New York, New York
       March 23, 2010

Respectfully submitted,

KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

Copies mailed to:

Richard M. Greenberg, Esq.
Michelle Maerov, Esq.